IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| COREY H., LATRICIA H., ANDREW B., and JASON E., by their parents and next friends, SHIRLEY P., BEVERLY HL, SHARON B., and STEPHEN E., on behalf of a class of similarly situated persons, <br><br> Plaintiffs, <br><br> v. <br><br> THE BOARD OF EDUCATION OF THE CITY OF CHICAGO, and THE ILLINOIS STATE BOARD OF EDUCATION, <br><br> Defendants. | No. 92 C 3409 <br><br> Judge Robert W. Gettleman |

**MEMORANDUM OPINION AND ORDER**

After more than 20 years of litigation and 14 years after a court-approved Settlement Agreement between plaintiffs and defendant Board of Education of the City of Chicago ("Chicago Public Schools" or "CPS"), and within months before the termination of the Settlement Agreement, CPS has decided to waste scarce public resources by filing a near-frivolous motion under Fed. R. Civ. P. 60(b) to decertify the class and vacate the judgment to which it had agreed in 1998 and again in 2010. (Doc. 852.) This effort is both mystifying and disturbing, driven perhaps by considerations that have no place in the administration of CPS's obligations under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et seq., ("IDEA") to educate children with disabilities in the least restrictive environment ("LRE").

**BACKGROUND**

A brief history of the litigation will put the current motion to vacate into perspective. The case was filed in 1992 on behalf of children in Chicago who had been identified by CPS as

needing special education services because of their disabilities and who had historically been segregated by CPS based on the categories of their disabilities, in violation of the IDEA's mandate to provide a free appropriate public education in the LRE.[1] Of the more than 500,000 children in CPS's 553 schools in 1998, at least 10% of them (more than 50,000) had been classified by CPS as having disabilities.

The case was originally assigned to Judge Leinenweber, who had denied motions to dismiss and certified a class defined as:

> [A]ll children who are enrolled in the Chicago Public Schools and who are or will be classified as having a disability by [CPS], and who are therefore subject to [CPS's] and ISBE's illegal practice and policy of failing to educate children with disabilities within the least restrictive environment appropriate to their needs.

Shortly before the case was assigned to the undersigned judge in October 1994, the parties had agreed to attempt to settle based upon the advice of three jointly-retained outside experts. As the court has noted,[2]

> The joint experts conducted an extensive, scientifically sound investigation and concluded that [CPS] was seriously out of compliance with the LRE requirements of the IDEA. According to the joint experts, children with disabilities in the Chicago public schools are typically educated in overly restrictive placements. The joint experts concluded that the children's placements were based mostly on the categories or severities of their disabilities, rather than their individual needs. Both the City and the State were found to have failed to monitor or implement the principles of educating children with disabilities in the least restrictive environment, or to train teachers and other educational professionals in these principles.

---

[1] 20 U.S.C. §1412(5)(B).

[2] Corey H. v. Bd. of Educ. of City of Chicago, 995 F.Supp. 900, 903 (N.D. Ill. 1998).

Although the first effort to settle failed, CPS and plaintiffs negotiated a comprehensive Settlement Agreement[3] that assumed the class definition approved by Judge Leinenweber in 1993, and that was approved by this court in February 1998. (Docs. 124-127.) As discussed more fully below, the CPS Consent Decree committed CPS to institute a number of reforms and conduct a program known as the "Education Connection," under which approximately one-third of its schools would be given resources sufficient to bring them into compliance with the IDEA's LRE mandate.

The other defendant, the Illinois State Board of Education ("ISBE"), chose to continue to litigate, and after a trial on the issue of liability the court found for plaintiffs and ordered ISBE to address appropriate remedies for its violation of the IDEA. Corey H., 995 F.Supp. 900. Eventually, ISBE entered into a Settlement Agreement with plaintiffs, which this court approved in June 1999. (Docs. 161, 164.) That Settlement Agreement and consent decree did not change or dispute the same class definition as assumed in the CPS Consent Decree.

Thus, for more than 14 years this court has presided over the administration of one or both Consent Decrees governing the provision of special education services to children with disabilities <u>who had been identified by CPS</u> as needing these services, along with extensive

---

[3]The Settlement Agreement was approved by the court after conducting a fairness hearing on January 16, 1998 (Docs. 123-127.) The parties and the court sometimes refer to the Settlement Agreements with CPS and ISBE and the orders approving them as the "Consent Decrees," the term that will be used hereafter in this opinion.

monitoring by the court-approved monitor (the "Monitor")[4] and monitors employed by CPS and ISBE. As would be expected in a case of this importance and complexity, even after the Consent Decrees for CPS and ISBE were in place, the parties, the Monitor, and the court have engaged in extensive post-decree proceedings. These have included (but by no means were limited to) the establishment of benchmarks and LRE indicators to measure progress, improvements to the Individual Education Programs ("IEPs") required by the IDEA for special education students, the training of teachers and staff, and the efforts by CPS to meet the goals of its Education Connection schools.

During the course of the post-decree proceedings, pursuant to the terms of the parties' agreements, the court extended both the CPS and ISBE Settlement Agreements because the court had concluded on several occasions that neither CPS or the ISBE were in substantial compliance with the terms to which they had agreed. In 2010, however, the court determined that the interests of all parties and the public required that both settlements should terminate, mindful of the fact that both CPS and ISBE would be expected to continue to comply with the requirements of the IDEA, and confident that the experience of Corey H. would deter a return to the unacceptable and unlawful segregation of children with disabilities in the Chicago public schools. Accordingly, with the parties' agreement this court ordered that the Consent Decree for ISBE would terminate on August 1, 2011, and for CPS on September 1, 2012. Thereafter, the Monitor is to prepare reports on the levels of compliance (and non-compliance) by each agency,

---

[4]The original court-appointed Monitor was Judge Joseph Schneider, formerly presiding judge of the County Division of the Circuit Court of Cook County that included the Mental Health Division. After Judge Schneider's retirement in 2003, the court appointed Kathleen Yannias, who has been serving continuously since then.

4

and the parties were given leave to file responses and objections to the reports, with the court to rule on any objections after briefing.[5] Both defendants executed agreed orders confirming these dates and their continued responsibility to comply with their Consent Decrees until those dates. (Docs. 735, 728.)

Despite having the end of this litigation firmly in sight, using the Seventh Circuit's recent decision in Jamie S. v. Milwaukee Public Schs., 668 F.3d 481 (7th Cir. 2012), as an excuse, CPS filed the instant motion on March 2, 2012, to vacate the consent decree to which it had agreed not once (in 1998) but twice (when it agreed in November 2010 to the extension of the decree to September 1, 2012).[6] With the briefing of the motion not scheduled to be complete until mid-May 2012, and oral argument having been set for June 2012,[7] the court's ruling on the motion was not expected until less than two months before CPS's obligations under its Consent Decree were set to expire. Thus, after more than fourteen years of enormous effort by CPS's dedicated professionals – teachers, principals, administrators, staff, and inside counsel – someone at CPS or in the City of Chicago administration made a decision to disavow the progress achieved under Corey H., thus incurring substantial costs and needlessly prolonging this litigation.

---

[5] The Monitor has issued her report on the ISBE's compliance with its obligations under its Settlement Agreement, and the parties are currently engaged in briefing responses and objections to that report.

[6] On March 5, 2012, CPS filed another motion under Rule 60 to vacate based on "substantial compliance" with its Settlement Agreement and Consent Decree (Doc. 852), which CPS recently supplemented with a lengthy memorandum directed to the Education Connection portion of the Consent Decree. (Doc. 877.) The court has continued this motion until it ruled on the instant motion. Since both these motions to vacate were filed under Fed. R. Civ. P. 60, the court fails to understand why they were not filed as a single motion, but nevertheless has honored CPS's decision to treat them separately.

[7] The court has determined that oral argument is not necessary.

As discussed below, CPS's motion to vacate is meritless for a number of reasons, and the case law on which it relies in no way justifies decertifying the class or vacating the judgment entered by agreement in 1998.

## **DISCUSSION**

In the January 1998 Consent Decree between plaintiffs and CPS, the parties implicitly acknowledged the previous certification of the class by Judge Leinenweber and agreed to a significant number of reforms aimed at educating all children in the class consistent with the mandates of the IDEA. These reforms included significant improvements to the IEPs, monitoring, reporting, and continuing education, along with supporting teachers and staff in the requirements of the IDEA. The Settlement Agreement also reconfirmed what came to be known as the "Education Connection Program" in which approximately one-third of the schools in the Chicago Public School System (178/553 as of January 1998) would be given special resources, training, and attention in developing multi-year plans to improve the education in the LRE of those children attending those schools who had been identified by CPS as having disabilities.

Pursuant to the Consent Decrees, CPS developed an elaborate Implementation Plan and proceeded to address and correct its previous segregated, categorical system of educating children with disabilities. To be sure, there have been many disagreements and contested issues among plaintiffs, CPS, and ISBE in the fourteen years since the Settlement Agreement was approved, but the court has witnessed and acknowledged on many occasions a great deal of progress. In 2010, as noted above, the court concluded that the time had come to close the curtain on <u>Corey H.</u>, and the parties began to negotiate the terms under which this case – and the

obligations of CPS and ISBE under their respective Settlement Agreements – could be brought to a conclusion.

On November 18, 2010, the court entered an agreed order (the "Extension Order," Doc. 728) pursuant to which CPS consented to an extension of all provisions of the 1998 Settlement Agreement (with certain exceptions not relevant to the current motion) to September 1, 2012. In the extension order, CPS also agreed (as did ISBE in its Agreed Extension Order, Doc. 735) that after the termination date the Monitor would issue a "report pertaining to compliance issues under the [Consent Decrees]," to which the parties would respond or object and the court would rule accordingly.

Notably, throughout all these proceedings, the thousands of hours of effort by all parties, counsel, and the court, the expenditure of tens of millions of dollars committed to the reform of the CPS special education system, and the participation of hundreds of thousands of children with disabilities – members of the certified class – in the Corey H. system established pursuant to the Consent Decrees, no one – not plaintiffs, ISBE, or CPS – has ever complained about class certification or the definition of the class as children "who are or will be classified as having a disability by [CPS]." Indeed, everything that has been accomplished, by agreement of CPS itself, has been with the acknowledgment of the existence of and for the benefit of this class of children. Yet CPS now seeks to decertify the class and dismiss and vacate the consent decree.

A consent decree is "essentially a settlement agreement subject to continued judicial proceedings." Cleveland Firefighters for Fair Hiring Practices v. City of Cleveland, 669 F.3d 737, 743 (6th Cir. 2012) (Keith, J., dissenting). Such decrees are "a strange hybrid in the law . . . at once a voluntary settlement agreement which could be fully effective without judicial

7

intervention and a final judicial order . . . placing the power and prestige of the court behind the compromise struck by the parties." Id. (citations omitted).  Because of this, consent decrees are construed strictly to preserve the bargained-for position of the parties, and courts have an affirmative duty to protect the integrity of their decrees and ensure that the terms are effectuated. Id.; United States v. Bd. of Educ. of the City of Chicago, 799 F.2d 281, 290 (7th Cir. 1986).

Despite their agreed nature, however, as judicial decrees they are subject to the rules generally applicable to other judgments and decrees. Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 378 (1992).  Fed. R. Civ. P. 60(b), on which CPS relies, provides that:

> On motion and upon such terms that are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: . . . (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it was based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application.

The Supreme Court has counseled that a district court should exercise flexibility in considering requests for modifications of an institutional reform consent decree, and that "[m]odification of a consent decree may be warranted when changed factual conditions make compliance with the decree substantially more onerous." Rufo, 502 U.S. at 384.  Even so, "Rule 60(b)(5) provides that a party may obtain relief from a court order when 'it is no longer equitable that the judgment should have prospective application,' not when it is no longer convenient to live with the terms of a consent decree." Id. at 383.  Therefore, the party seeking modification "bears the burden of establishing that a significant change in circumstances warrants revision of the decree." Id.

Additionally, "modification should not be granted where a party relies on events that actually were anticipated at the time it entered the decree.  If it is clear that a party anticipated

8

changing conditions that would make performance of the decree more onerous but nevertheless agreed to the decree, that party would have to satisfy a heavy burden to convince a court that it agreed to the decree in good faith, made a reasonable effort to comply with the decree, and should be relieved of the undertaking under Rule 60(b)." Id. at 385 (internal citations omitted).

As noted, CPS agreed to an extension of the decree on November 18, 2010. As plaintiffs argue, nothing has changed since that time to suggest that CPS's compliance with the terms of the consent decree has become any more onerous, and no changes have occurred that could not have been anticipated by CPS. Thus, the court agrees with plaintiffs that CPS has waived any argument that the decree should be modified because it has become more onerous based on any factual change in circumstances between the time it entered the decree in 1998 and November 2010. Further, the court finds that CPS has failed to carry its heavy burden of establishing that any change since November 2010 justifies relief from the undertaking to which it agreed.

CPS has argued predominately, however, that there has been a significant change in the law that justifies modification of the decree. A consent decree must be modified if "one or more of the obligations placed on the parties has become impermissible under federal law . . . and may be warranted when the statutory or decisional law has changed to make legal what the decree was designed to prevent." Rufo, 502 U.S. at 388. Neither of these two scenarios has occurred. The IDEA has not materially changed. CPS is still required to educate children with disabilities in the least restrictive environment. The IDEA still prohibits segregating children needing special education services based on the categories of their disabilities, which was the primary violation addressed by the Consent Decree. Thus, there has been no "change" in the underlying substantive law that justifies revision or, as CPS requests, revocation of the consent decree.

Nevertheless, CPS argues that the Supreme Court's decisions in Wal-Mart Stores, Inc. v. Dukes, ___ U.S. __, 131 S.Ct. 2541 (2011), and more specifically, the Seventh Circuit's decision in Jamie S. represent a significant change in the law of class certification justifying its Rule 60(b) motion. The court disagrees.

First, it hardly needs stating that neither Dukes nor Jamie S. "changed" the law on class certification. Class certification is still governed by Fed. R. Civ. P. 23, and the requirements of that rule have not changed substantively since Judge Leinenweber certified the instant class, and have not changed at all since November 2010 when CPS agreed to the extension of the decree. Indeed, both Dukes and Jamie S. specifically reaffirm that class certification is governed by Rule 23, and each analyzed the proposed class under the well-established mandates of that rule. Dukes, 131 S.Ct. at 2548 ("Class certification is governed by Federal Rule of Civil Procedure 23."); Jamie S., 668 F.3d at 493 ("A district court may certify a class for class-action treatment only if it satisfies the four requirements of Federal Rule of Civil Procedure 23(a) . . . and one of the conditions of Rule 23(b)."). The two cases represent nothing more than the application of Rule 23 to specific sets of facts or, perhaps, to a specific type of claim under two distinct federal laws – Title VII and the IDEA – both of which provide for individual equitable relief in addition to injunctive relief.

Thus, while Dukes and Jamie S. may represent clarifications of law, they do not represent a change in law that requires modification of this consent decree. The Supreme Court's caution in Rufo is especially appropriate here: "[t]o hold that a clarification in the law automatically opens the door for relitigation of the merits of every affected consent decree would undermine the finality of such agreements and could serve as a disincentive to negotiation of settlements in

institutional reform litigation." Rufo, 502 U.S. at 389. Under CPS's theory, after Dukes and Jamie S., every class-wide consent decree (or at least those remedying alleged violations of Title VII and the IDEA) would be subject to review under Rule 60(b). That is not the law, nor is it the intention of the Supreme Court or the Seventh Circuit.

Nonetheless, Rufo does note that "while a decision that clarifies the law will not, in and of itself, provide a basis for modifying a decree, it could constitute a change in circumstances that would support modification if the parties had based their agreement on a misunderstanding of the governing law." Rufo, 502 U.S. at 390. To avail itself of this language CPS appears to argue that the instant class would not be certifiable under Jamie S. and, had CPS known that back in 1993, it would not have agreed to the settlement and would have continued to segregate special needs students based on categories of their disabilities in violation of the IDEA. Nonsense.

Moreover, the procedural and factual posture of Jamie S. is so radically different from the instant case that it cannot possibly serve as a basis for vacating the Consent Decree. First, unlike CPS, the defendant in Jamie S. (the Milwaukee Public Schools) had never consented to a settlement or anything else that acknowledged class-wide relief. Instead, the state education agency had reached a settlement with plaintiffs and attempted to force that settlement, including a contested class certification, on the Milwaukee Public Schools. In the instant case, as noted above, CPS agreed to a class-wide settlement that incorporated relief for the class that had been certified by Judge Leinenweber, and has operated under that agreement in excess of fourteen years.

Equally important, unlike Jamie S., the identity of the class members in the instant case is not indefinite at all from CPS's viewpoint, because CPS itself controls that membership. Once again, Judge Leinenweber's order granting class certification defines the class as those students "classified as having a disability by [CPS] ." Thus, it is only after CPS makes such a classification that a child joins the certified class – a notion that CPS has understood and operated under throughout the history of the administration of its Consent Decree. Thus, unlike Jamie S., in the instant case membership in the class is easily defined: CPS itself makes that classification on a student-by-student basis, as it is required to do under the IDEA. Nothing could be simpler. Any child who is not classified as having a disability by CPS is simply not a member of the class.

Also, unlike Jamie S., the Corey H. Consent Decree does not contemplate individual remedial relief. Any child, or his or her parents, who disagrees with CPS's classification has a right to contest the classification individually by instituting "due process proceedings" under the IDEA. 20 U.S.C. §1415. Any such individual contest is wholly outside the Consent Decree or this case, and the parties have never contended otherwise. Indeed, both the ISBE Settlement Agreement (Doc. 164, § 51(g)) and the CPS Settlement Agreement (Doc. 124, § 76(h)) specifically provide that any individual complaint by plaintiffs must be "limited to systemic issues and may not be used to resolve individual complaints." (Emphasis added.) In fact, there have likely been thousands of due process hearings in the Chicago system under the IDEA during the course of this litigation.

For these reasons, CPS's argument that the class certification violates the commonality requirement of Rule 23(a) is meritless. Plaintiffs have attacked only systemic failures and

district-wide policies that apply to every member of the certified class (children who have been classified by CPS as having a disability). A quick reading of the CPS Settlement Agreement and the Implementation Plan makes this crystal clear. Unlike in Jamie S., children who are classified by CPS as having a disability are automatically members of the class, and do not have to opt-in and make "a claim for entitlement to compensatory education." Jamie S., 668 F.3d at 499. As the Seventh Circuit noted in Jamie S., the Supreme Court's decision in Dukes, 131 S.Ct. at 2552-54, indicates that an illegal policy that applies to the entire class "provide[s] the 'glue' necessary to litigate otherwise highly individualized claims as a class." 668 F.3d at 498.

Finally, the remedial scheme in Jamie S. required the Milwaukee school district to craft "compensatory-education remedies," an equitable remedy unique to IDEA claims that reimburses the out-of-pocket education expenses incurred by children who are improperly delayed or denied entry into special education programs. Jamie S., 668 F.3d at 485. "Reimbursement of out-of-pocket educational expenses is similar in kind to the equitable back pay remedy at issue in Dukes – both are forms of monetary relief that require determinations of each class member's individual circumstances." N.B. ex rel. Buchanan v. Hamos, 2012 WL 1953146, at *10 (N.D. Ill. May 30, 2012). The Seventh Circuit therefore held that class certification under Rule 23(b)(2) was inappropriate, concluding that "[w]hile the compensatory-education remedies will often or always be injunctive in nature, there can be no single injunction that provides final relief to the class as a whole." Jamie S., 668 F.3d at 499.

The remedy scheme agreed to by the parties in the instant case provides no such individualized relief. Once again, in the instant case, unlike Jamie S. but like McReynolds v. Merrill Lynch, 672 F.3d 482 (7th Cir. 2012), plaintiffs' claims are based on systemic failures

13

and, even more strongly than in McReynolds, the defendant now seeking to decertify the class agreed to systemic reforms that specifically eliminated the types of individual issues that led to the Jamie S. decision. In short, Jamie S. does not justify or compel decertifying the Corey H. class or vacating the Consent Decree.

## CONCLUSION

For the foregoing reasons, CPS's motion to vacate the Consent Decree (Doc. 852) is denied. Because briefing on CPS's "second" Rule 60 motion to vacate (as recently supplemented) has been stayed pending this ruling, the court will set a briefing schedule at the next status hearing on July 27, 2012.

**ENTER:** **July 19, 2012**

_____
**Robert W. Gettleman**
**United States District Judge**