IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| COREY H. *et al*, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 92 C 3409 |
| | ) | Judge Gettleman |
| THE BOARD OF EDUCATION OF THE | ) | |
| CITY OF CHICAGO, et. al. | ) | |
| Defendants. | ) | |

**PLAINTIFFS' RESPONSE TO CHICAGO BOARD OF EDUCATION'S MOTION
FOR A STAY PENDING APPEAL**

Plaintiffs, by their undersigned counsel, respond to the Chicago Board of Education's ("CPS"), Motion For A Stay Pending Appeal as follows:

**I. Standard for deciding F.R.Civ. P. 62(c) motions to stay proceedings pending appeal.**

In exercising its discretion to decide whether to stay an injunction pending appeal, a court is to consider: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties' interested in the proceedings and (4) where the public interest lies. *Hilton v. Braunskill,* 481 U.S. 770, 776 (1987). The party seeking a stay has the burden of proving that these factors warrant a stay, but it only need consider the last two factors if movant has made a sufficient showing of both likelihood of success and irreparable harm in the absence of a stay. *Matter of Forty–Eight Insulations, Inc.,* 115 F.3d 1294, 1301 (7th Cir.1997). If movant has passed that threshold showing, then the court is to consider all four *Hilton* factors using a sliding scale approach. *Id.*

Here, because CPS has shown neither a substantial likelihood of success nor irreparable injury, there is no need to reach the factors of injury to the other parties or the public interest. Consideration of those factors, nevertheless, also counts against grant of a stay. Moreover, the fact that there is no appellate jurisdiction assures CPS's appeal is not likely to succeed.

**II. Likelihood of success on the merits.**

CPS bases its argument for vacation of its Consent Decree on the following propositions, none of which withstand scrutiny: i. *Jamie S* changed the legal standards for class certification in cases of this nature; ii. Because the 1993 class certification would not pass muster under the *Jamie S* standard, the class certification must now be vacated, and; iii. Because decertification of the class renders the class without a representative with standing to represent the class, the court has no jurisdiction to continue enforcement of the CPS Decree.

    **A. CPS has proffered no reason for disputing this Court's finding that *Jamie S* did not change the law of class certification applicable to this case.**

CPS gives no reason why the Seventh Circuit might not agree with this Court's explicit finding that *Jamie S.* did not change Seventh Circuit law on class certification. Decision at 10. Because CPS's motion is based "exclusively, not 'predominately,'" on the proposition that *Jamie S* effected a critical change in Rule 23 doctrine, CPS Memo In Support of Motion To Stay Pending Appeal at 3, ("CPS Memo"), its failure to demonstrate such a change is fatal to CPS's motion.

    **B. Even if *Jamie S* had changed relevant Seventh Circuit law of class certification, the change would not warrant decertification of the *Corey H* class.**

        **i. Because *Jamie S's* standards for the composition of a class of students with disabilities could not affect the implementation of any remaining *Corey H* obligations, applying them to *Corey H* now would be nonsensical.**

CPS simply assumes that, if on retrospective analysis, it appears unlikely that the *Corey H* class would have been certified in 1993 under the *Jamie S* standards, the class should now be decertified. CPS does not explain its rationale for such a formalistic *nunc pro tunc* analysis of Rule 60(b)(5)'s change in law ground for vacating consent decrees. To the exact contrary, *Rufo v. Inmates of the Suffolk County Jail*, 502 U.S. 367, 391 (1992), makes clear that a Rule 60(b)(5) determination of a change in the law is not an abstract or theoretical exercise, but rather, serves a functional goal of resolving an actual problem in a case:

2

Once a moving party has met its burden of establishing either a change in fact or in law warranting modification of a consent decree, the district court should determine whether the proposed modification is suitably tailored to the changed circumstance. . . . Once a court has determined that changed circumstances warrant a modification in a consent decree, the focus should be on whether the proposed modification is tailored to resolve the problems created by the change in circumstances.

CPS has not tried to explain how decertification, or even modification, of the *Corey H* class is needed to resolve any problem in the case or help make the discharge of its duties more efficient, effective or less expensive. Such an argument would make no sense. What essentially remains to be done in this case is the Monitor's Report. There is simply no plausible theory by which the definition or redefinition of the *Corey H* class would affect either the need for, or the production of, that Report.

The essential vice the court found in the *Jamie S* class definition was the need to determine individually for each class member her eligibility for class membership and her appropriate remedy:

> That much is clear from the intricate remedial scheme ordered by the district court, which requires thousands of individual determinations of class membership, liability, and appropriate remedies. While the compensatory-education remedies will often or always be injunctive in nature, there can be no single injunction that provides final relief to the class as a whole.

*Jamie S. v. Milwaukee Public Schools,* 668 F.3d 481, 499 (7th Cir. 2012). In writing her report, the Monitor will not be providing injunctive relief of any kind, individualized or otherwise. To the exact contrary, the Monitor's Report can be expected to highlight "the glue" that ties the various remedial measures together in providing the holistic approach that effective LRE compliance requires.

Finally, Plaintiffs suggest that what CPS describes as this Court's displeasure over the timing of CPS's motion to vacate is attributable not, as CPS asserts at p. 2, to the fact that CPS waited to file this motion about 30 days after *Jamie S* was decided. Rather, as the Court's Memorandum Opinion makes crystal clear, what is problematic is the fact that CPS filed its motion to vacate just

months before the termination of its Settlement Agreement, when its request for class decertification could have no functional bearing on anything remaining to be done in the case.

    ii. **Even if *Jamie S's* class certification standards represented a change in the law, the *Corey H* class would meet those standards.**

CPS asserts two grounds for disagreeing with this Court's finding that the *Corey H* class does not violate *Jamie S'* class certification requirements; first, that *Jamie S* proscribes a class definition that would include all students with disabilities and, second, that *Corey H's* remedial measures are too varied and individualized to meet *Jamie S's* standard for satisfying Rule 23's common question requirement. Neither argument has any likelihood of success on appeal.

    1. ***Jamie S* does not proscribe a plaintiff class composed of all of a school district's students with disabilities as long as all such students suffer from a common federal law violation and are subject to a common injunctive remedy.**

CPS argues that *Jamie S's* approval of the district court's refusal to certify a class of all district students with disabilities means that the Seventh Circuit would also disapprove of the "virtually identical" district-wide class of students with disabilities in *Corey H*. CPS Memo at 4. The fallacy in this argument is that the *Corey H* class, unlike the *Jamie S* class, does not include students "whose procedural or substantive rights under the IDEA were violated **in any way"** and does not "lump together thousands of disparate plaintiffs with **widely varying individual claims**." *Jamie S* at 493. (emphasis added). Plaintiff class members, unlike those in *Jamie S,* share a single and common claim: they are not being educated within the least restrictive environment in violation of the IDEA, 20 U.S.C. § 1412(a)(5)(A). *Corey H* does not require identification of any individual student either for class inclusion or class relief, which is the exact opposite of the *Jamie S* class. There is, therefore, no reason to believe the class here would run afoul of the *Jamie S* class certification criteria.

4

## 2. The CPS *Corey H* remedial measures satisfy *Jamie S's* requirement that injunctive relief be provided uniformly to all class members.

CPS's argument that the Seventh Circuit would be likely to overturn this Court's refusal to vacate class certification on the ground that it runs afoul of *Jamie S's* standards for uniform injunctive relief for all class members ignores both the language of *Jamie S* and the history of federal court remedies for government policies and practices that violate class members' federal rights. Where the legal violation that class members suffer in common arises from a variety of causes, Rule 23 does not, as CPS would have it, bar the federal courts from providing remedies for more than one of those causes.

The racial desegregation cases offer perhaps the strongest illustration of why this Court was correct in finding the CPS Consent Decree's multi-faceted remedial approach does not violate Rule 23's commonality requirement. Had federal courts adopted CPS's rule allowing only one type of remedy for violations of legal rights that arise from a multiplicity of causes, the federal courts would have been powerless to attack racial school segregation in any way but adjusting student composition. The Court, however, recognized that such segregation had grown out of a structure that had many components: "Racial identification of the system's schools was complete, extending not just to the composition of student bodies at the two schools but to every facet of school operations—faculty, staff, transportation, extracurricular activities and facilities." *Green v. County School Bd. of New Kent County, Va.*, 391 U.S. 430, 436-437 (1968). Not only did these famous six "Green factors" become the touchstone for determining the breadth of the remedies required to end racial segregation in schools, but the federal courts went on to expand the nature of the remedies depending on the nature of the violations. As summarized by one commentator:

> Six such areas are predefined in Green, but Green contemplates the possibility of others, and lawyers in other school desegregation cases have often taken to examining a wide range of areas in which racial disparities may exist. For instance, school desegregation cases have examined racial disparities in student discipline, in enrollment in advanced, gifted, or remedial

5

courses, in assignment of students to alternative schools, and in the identification of students for (and in the provision of) special education.

Chinh Q. Le, RACIALLY INTEGRATED EDUCATION AND THE ROLE OF THE FEDERAL GOVERNMENT, 88 N.C. L. Rev. 725, 761-762 (2010).

The need for a variety of injunctive approaches toward dismantling the structures responsible for segregating students with disabilities is as clear in *Corey H* as it is in the context of racial school segregation. Nothing *Jamie S* says purports to limit federal courts' power to use the multi-faceted injunctive remedies that are necessary to protect all students with disabilities from systemic violations of their common right to be educated in the LRE. To the contrary, *Jamie S* not only limits its restriction on injunctive remedies to cases where individual class members would be entitled to different forms of individualized relief, but it also recognizes that even in such cases class-wide injunctive remedies could be appropriate where the violations arise from illegal policies:

> Child-find inquiries, like other aspects of the IDEA, are necessarily child specific. There is no such thing as a "systemic" failure to find and refer individual disabled children for IEP evaluation—except perhaps if there was "significant proof" that MPS operated under child-find policies that violated the IDEA. . . . As the Supreme Court noted in Wal–Mart, an illegal policy might provide the "glue" necessary to litigate otherwise highly individualized claims as a class. . . . . But again, as in Wal–Mart, proof of an illegal policy "is entirely absent here."

*Jamie S* at 498 (citations omitted).

Finally, CPS's argues that the multi-faceted nature of the IDEA regulations on the requisites for LRE implementation demonstrate the lack of commonality in the Decree's enforcement provisions. CPS Memo at 4-5. To the exact contrary, those regulations demonstrate that the CPS Decree's multi-faceted, holistic approach to achieving LRE compliance is exactly the type of remedial approach the United States Department of Education has determined is necessary for full LRE compliance.

In sum, CPS has shown no reason to conclude there is any likelihood that the Seventh Circuit would reverse this Court's determination that the relief granted Plaintiffs is in conformity with the class certification standards set forth in *Jamie S*.

**C. Even were the Seventh Circuit to find class decertification warranted under the standards of *Jamie S*, dismissal of the case for lack of subject matter jurisdiction would not be the proper disposition since this Court would still have jurisdiction to certify a reformulated class or subclasses that would meet the narrow class definition that CPS argues *Jamie S* requires.**

CPS's argument for a stay is predicated on the assumption that if the Seventh Circuit were to reverse this Court's denial of its motion for class decertification, the entire case would have to be dismissed for lack of subject matter jurisdiction. CPS Memo at 3. This assumption, however, is based on the false premise that a determination that the original class definition is no longer workable means the case must be dismissed for lack of jurisdiction because there is no class representative with standing. To the contrary, the case law is clear that because a class is itself an entity with members who may continue to have standing, a class action should not be dismissed on standing grounds until the class members who retain standing have had an opportunity to form a class that can resist a challenge on standing or other grounds. *See e.g. Wiesmueller v. Kosobucki,* 513 F.3d 784, 786 (7th Cir.2008)("The named plaintiff who no longer has a stake may not be a suitable class representative, but **that is not a matter of jurisdiction** and would not disqualify him from continuing as class representative until a more suitable member of the class was found to replace him.")(emphasis added). In *Lynch v. Baxley*, 651 F.2d 387 (5th Cir. 1981), the Fifth Circuit explained why classes that are challenged on standing grounds must be given an opportunity to reformulate in order to try to attain proper standing:

> But the likely absence of standing is not the end of the matter. Even if the named plaintiffs lacked standing the class certified by the district court has a "legal status separate from the interest asserted by (the named plaintiffs),". . . . The class of persons on whom these new emergency detention provisions would operate is a narrower group than the original class certified. . . the claims of this narrower class remain "alive." Under these circumstances we find that the district court erred in dismissing the case without giving members of the original

7

class with live claims an opportunity to "become plaintiffs by amendment of the complaint or by intervention and thereby save the subclass action."

651 F.2d at 388. *See also Mazza v. American Honda Motor Co., Inc.* 666 F.3d 581, 596 (9th Cir. 2012). The procedural posture here is similar to that in the seminal case of *United States Parole Commission v. Geraghty,* 445 U.S. 388, 404 (1980), where the Court required remand for a redetermination of class certification because "Respondent had no real opportunity to request certification of subclasses after the class he proposed was rejected."

Because Plaintiffs would, therefore, have a right on remand to seek to reformulate their class definition in order to conform with any *Jamie S* requirements the Court might find applicable, CPS's argument for a stay on the ground that the Seventh Circuit would be likely to order dismissal for lack of jurisdiction must fail. CPS may, of course, argue on remand against such reformulation either of the *Corey H* class or of suitable subclasses pursuant to Rule 23(c)(4) and (5). CPS has not tried, however, to meet its burden on a motion to stay of showing that Plaintiffs would be unlikely to succeed in continuing this case as a class or as subclasses pursuant to any *Jamie S* standards the Court might find applicable.

**III. CPS's failure to show irreparable injury from denial of a stay warrants denial of its Motion, even if it could satisfy the other three factors required for a stay pending appeal.**

CPS asserts two types of irreparable harm from denial of its motion for a stay: first, payment of the Monitor's and Plaintiffs' attorneys fees that would be avoidable should CPS prevail on its motion to vacate and, second, the use of the Monitor's Report to both unfairly criticize CPS and support potential litigation by those with interests "at odds" with CPS interests. CPS Memo at 7.

Plaintiffs find it hard to take CPS's fee argument seriously not only because the fees that might be avoided by a stay are relatively insignificant at this stage of the case, but also because CPS obviously knew that its motions to vacate, its Seventh Circuit appeal and this motion to stay, might

8

well incur Plaintiffs' fees substantially greater than those CPS would have paid had it simply let its Consent Decree expire on schedule.

As to a stay's effect on the preparation of the Monitor's Report, CPS asserts that the Monitor could simply write the Report after a Seventh Circuit decision affirming this Court's denial of CPS's Motion to Vacate. CPS Memo at 8. CPS does not explain, however, what, if anything, it would do to assure the Monitor's availability to write the Report after the Seventh Circuit's affirmance. The Monitor and her staff cannot be expected to sit for months without pay waiting for the Seventh Circuit's decision. Therefore, in order to assure they not take on new employment that would preclude their writing the Report, CPS would have to pay not only their regular salaries during the interim period, but also a premium for the costs of their foregoing the development of new opportunities for the next phase of their careers.

As to Plaintiffs' attorneys' fees, Plaintiffs do not concede that they would not be entitled to fees, even if CPS's motion to vacate were to succeed on appeal. Their defense of the class against a motion to decertify is a duty inherent in the structure of the Consent Decree which CPS implicitly agreed to pay as part of its agreement to bring CPS in compliance with the LRE. Nevertheless, Plaintiffs would agree to put in escrow any fees for defending against CPS's motion to vacate that might become subject to CPS objection on the ground of Plaintiffs' failure to prevail in opposing such motion.

Although CPS's objection to the Monitor's Report is a more salient ground for asserting irreparable harm, it also fails because it rests on the flawed premise that criticism of, and litigation against, some of CPS's policies and practices is necessarily harmful to CPS. Here, CPS is conflating the natural desire of some of its current administrators to avoid criticism with the interests of CPS itself, of the students it educates and of the public to which it is ultimately responsible. CPS is making the same unsuccessful argument here that it made in seeking to seal

9

the Coulter Report on the ground that public access "is guaranteed to cause annoyance, embarrassment, oppression, and undue burden or expense to the Chicago Board." CPS Motion For Protective Order, p. 5, ¶ 11. Doc. #749. As Plaintiffs previously argued against CPS's motion to seal that Report, the public's interests in gaining information needed to evaluate CPS officials' performance outweighs those officials' personal interests in avoiding critique of their performance. Plaintiff's Response to CPS Motion For Protective Order, pp. 3-6. Doc. #758.

CPS would, nevertheless, discount the value of the Monitor's Report as a source of useful public information because it presumes the Monitor's Report will target it for unfair criticism. CPS Memo at 7. CPS infers this conclusion from its belief that the Monitor's ISBE Report criticized CPS "without any significant analysis of the current state of the Board's IDEA compliance." *Id.* Because the Monitor's ISBE Report in fact praises the many ways in which CPS has improved education of students with disabilities in the LRE, it is apparent that CPS deems any criticism whatever of its compliance efforts as unfair, the result of bias and likely to cause irreparable injury.[1]

CPS obviously disagrees with Plaintiffs' oft-repeated characterization of its attacks on the Monitor's fairness and impartiality as unsupported, unsupportable and unprofessional. Plaintiffs' Reply to CPS's Response to the Monitor's Report on ISBE's Implementation of Its Settlement Agreement, at 1-2. Doc.# 881. Regardless of how fervently CPS believes its personal attacks on the Monitor are justified, however, the absence of evidence in the record to support those attacks fatally undermines its assertion that it will suffer irreparable injury because of the potential of critical findings in the Monitor's Report.

---

[1] In Plaintiffs' Response to the Monitor's Report on ISBE's Implementation of its Settlement Agreement, Doc.#869, and Plaintiffs Reply To CPS's Response to the Monitor's Report, Doc. 881, Plaintiffs point out how ISBE's monitoring reports, the Coulter Study and the Monitor's ISBE Report all analyze data demonstrating great strides in CPS compliance. CPS, nevertheless, attacks all three for their unfair criticism and paucity of praise.

CPS also argues the Monitor's Report will cause irreparable injury because "those whose interests are at odds" with those of CPS will use the Report as ammunition for further litigation. Memo. at 7. CPS's argument that further litigation by those who presumably would be suing to try to vindicate the legal rights of students with disabilities would necessarily be harmful to CPS depends on the assumption that courts would not find such litigation meritorious. CPS does not cite its track record as evidence that such litigation should be presumed to be nonmeritorious. Moreover, to the extent the Monitor's Report might be helpful to those considering litigation, it would most likely help them make more informed judgments as to the need for and likelihood of success of potential litigation. There is, indeed, no reason to discount the possibility that the Monitor's Report might discourage litigation against CPS both by demonstrating the many ways CPS has improved its services to students with disabilities and by informing CPS itself as to measures it should take that would make litigation unnecessary. Furthermore, to the extent the Monitor's Report might provide information that litigants would otherwise need to replicate through formal discovery, the Report would serve the judicial policy of reducing the time and costs of discovery. *See Wilk v. American Medical Ass'n,* 635 F.2d 1295, 1299 (7th Cir.1980).

Finally, CPS cites the harm the Monitor's Report will have on "local educational officials' ability to exercise educational judgment." Memo. at 7. Unless CPS is agreeing that it will continue to be subject to Decree enforcement after September, 2012, this ground for asserting harm makes no sense.

In sum, because a showing of irreparable injury is a necessary element of a motion to stay pending appeal, the failure to make such a showing is fatal to the motion and precludes the need to make a sliding scale examination of the two remaining elements of a stay, the harm to the Plaintiffs and the interests of the public. Although CPS's failure here to show irreparable harm

11

eliminates the need for such a sliding scale analysis, Plaintiffs will briefly address these elements to show that neither of them supports a stay.

## IV. Grant of the stay would harm Plaintiffs and the public interest.

A stay would harm Plaintiffs' interests in the issuance of a timely Monitor's Report on CPS's compliance with its Consent Decree obligations, which was the only consideration Plaintiffs received in exchange for giving up their right to seek another extension of the Decree that would require CPS's substantial compliance with many of its as yet unfulfilled obligations. Grant of CPS's motion to stay would diminish the utility of that Report because delay in its completion would render the data it would rely upon less fresh. Further, even if CPS were to pay the Monitor and her staff to remain available to write her Report after a stay, the exigencies of life would add uncertainty to whether she and her staff would in fact remain available.

Plaintiffs suggest that their interests, as well as the coterminous interests of the general public, will be harmed by grant of the stay because a Monitor's Report on CPS Decree compliance produced in accordance with the existing time frame would serve the following important ends:

i. The Monitor's assessment of the degree of CPS compliance and noncompliance with its Decree obligations could provide CPS teachers, supervisors and policy makers with information that could be critical to future improvements in the ways CPS educates students with disabilities in the LRE;

ii. Such Monitor's assessment could provide ISBE and the U.S. Department of Education with information that could be critical to the evolution of their approaches toward monitoring CPS's delivery of special education services;

iii. Such Monitor assessment could provide parents of Chicago public school students with disabilities information critical to their ability both to effectively advocate for systemic improvements in the education of students with disabilities and to utilize CPS services on behalf of their children;

iv. Such Monitor assessment could provide voters and taxpayers important information regarding the job performance of public officials and the use of public funds and;

v. Such Monitor assessment could provide advocates for the rights of students with disabilities data that could be invaluable in deciding how best to use their resources to improve the education of such students.

12

Plaintiffs recognize that public officials often find evaluations by outsiders difficult to take and inconvenient to have to respond to. Nevertheless, the potential role of the Monitor's Report can hardly be overstated. Over the last decade and a half, the Illinois and Chicago Boards of Education have expended enormous resources and effort in figuring out how best to address one of society's most difficult issues, how best to educate students with disabilities in the LRE. The Monitor's evaluation of CPS's successes, failures and remaining challenges in addressing that issue promises to be a critically important resource not only to the Chicago community, but also to everyone in the country who faces similar challenges. By threatening the issuance of that Report either in its entirety or in its most effective form, grant of CPS's motion to stay could significantly harm the interests of Plaintiffs and the public, locally and nationally.

**V. CPS's appeal will likely fail because the Seventh Circuit is likely to dismiss the appeal for lack of appellate jurisdiction.**

Although CPS does not spell out its theory of appellate jurisdiction, its claim is apparently that this Court's denial of its Rule 60(b)(5) motion to vacate the 1993 class certification order is appealable under 28 U.S.C. § 1292(a)(1) because it effectively refuses to dissolve or modify an injunction. The many holes in this argument are fatal.

In *Gardner v. Westinghouse Broadcasting Co.*, 437 U.S. 478, 480-81 (1978), the Court noted that the § 1292(a)(1) exception granting appellate jurisdiction for certain interlocutory orders "is a narrow one and is keyed to the 'need to permit litigants to effectually challenge interlocutory orders of serious, perhaps irreparable, consequence.'" The Court then denied appellate jurisdiction over an order "denying class certification . . . (which) did not have any such 'irreparable' effect." Here also, this Court's refusal to vacate the class certification will have no irreparable, or even serious, effect.

The only effects of such refusal that CPS points to are, as discussed above, the issuance of the Monitor's report and the prospect of paying the Monitor's and Plaintiffs' fees. As to the latter, CPS has asserted, but not explained, why such fees could not be recouped if warranted. Also, the prospect that this Court might in the future order fees for Plaintiffs' counsels' work is obviously not grounds for appellate jurisdiction. *See Gas Aggregation Services, Inc. v. Howard Avista Energy*, LLC, 458 F.3d 733, 739 (8th Cir.2006)(appeal of order directing payment of attorneys' fees premature because no judgment on a separate document was entered).

As to the Monitor's Report, CPS, as noted above, explains that it expects and fears her unfair criticism. CPS does not explain, however, why this Court's denial of its request to halt the writing of the Report should be deemed to have the practical effect of refusing to dissolve an injunction and, thereby, constitute an appealable order under 28 U.S.C. § 1292(a)(1). *Jamie S* pointed out the familiar rule that "[a]n order … is properly characterized as an 'injunction' when it substantially and obviously alters the parties' pre-existing legal relationship." *Jamie S* at 490. The Monitor's Report would, and could, not have such a consequence.

In finding nonappealable a District Court's statements interpreting a consent decree, the Seventh Circuit stated:

> (D)istrict judges are free to provide parties with their thoughts informally. . . .if the district judge neither puts pen to paper nor identifies an authoritative document, nothing of legal significance has happened – for oral statements are not judgments and under Rule 65(d) have no legal effect, and until the judge enters something meeting the general description of an injunction or other judgment, the matter remains pending in the district court.

*Hispanics United of DuPage County v. Village of Addison,* 248 F.3d 617, 620-21 (7th Cir.2001). Similarly, here, the forthcoming Monitor's Report, as well as any comments on it that this Court may feel disposed to make, albeit to be communicated in writing rather than orally, do not come close to the requisites of either a Rule 65(d) qualified injunction or an order having the practical effect of an injunction.

A final reason the Seventh Circuit is likely to deny interlocutory relief is that CPS's second Rule 60(b)(5) motion to vacate the CPS Consent Decree on the basis of substantial compliance and other grounds is still pending in this Court. Doc # # 853-1, 877. Although for its own unexplained reasons, CPS decided to move to vacate its Consent Decree through filing two separate motions to vacate the consent decrees, the relief sought, albeit on different theories, is the same. Seventh Circuit case law is clear that there can be no interlocutory appeal of the denial of injunctive relief where similar relief may still be available in the district court. *See Albert v. Trans Union Corp.,* 346 F.3d 734, 739 (7th Cir.2003) (district court's denial of injunctive relief is not appealable under § 1292(a)(1) if "substantial and similar relief" is still available to the plaintiff); *Cherry v. Berge*, 98 Fed. Appx. 513, 516, 2004 WL 764141, 3 (C.A.7 (Wis) 2004)("And because Cherry still had injunctive relief available in the district court, the court's order was not appealable under the narrow exception for denials of injunctive relief under 28 U.S.C. § 1292(a)(1)"). Thus, CPS's motion to stay should be denied, not only because its motion to vacate is unlikely to succeed on the merits, but also because it is unlikely to succeed as a result of the lack of appellate jurisdiction.

In sum, a stay of all proceedings in the District Court pending appeal should be denied not only because CPS cannot meet the four criteria for a stay under F.R.Civ. P. 62(c), but also because the Seventh Circuit is likely to dismiss the appeal for lack of appellate jurisdiction.

WHEREFORE, Plaintiffs respectfully request that CPS's Motion For A Stay be denied.

Respectfully submitted,

s/John S. Elson

| | |
|---|---|
| John S. Elson | Sharon Weitzman Soltman |
| Northwestern University Legal Clinic | 2737 Harrison Street |
| 357 East Chicago Avenue | Evanston, Illinois |
| Chicago, Illinois  60611 | (847) 869-9510 |
| 312-503-8573 | |

15