IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| COREY H., LATRICIA H., ANDREW B., and JASON E., by their parents and next friends, SHIRLEY P., BEVERLY HL, SHARON B., and STEPHEN E., on behalf of a class of similarly situated persons,<br><br>    Plaintiffs,<br><br> v.<br><br>THE BOARD OF EDUCATION OF THE CITY OF CHICAGO, and THE ILLINOIS STATE BOARD OF EDUCATION,<br><br>    Defendants. | No. 92 C 3409<br><br>Judge Robert W. Gettleman |

## **MEMORANDUM OPINION AND ORDER DENYING CPS MOTION TO STAY PENDING APPEAL**

Defendant Board of Education of the City of Chicago ("Chicago Public Schools" or "CPS") has filed a motion to stay all proceedings in this case (Doc. 894-895) pending its appeal of this court's July 19, 2012 Order (Doc. 886) denying its "first" Fed. R. Civ. P. 60 motion to vacate the 1998 Consent Decree.[1] For the reasons discussed below, the court denies CPS's motion to stay.

The parties agree on the familiar standards required to justify a stay pending appeal. As CPS articulates those standards (Doc. 895):

> (1) whether the stay applicant has made a strong showing that it is likely to succeed on the merits;
>
> (2) whether the applicant will be irreparably harmed absent a stay;

---

[1]Corey H. V. Board of Education of City of Chicago, 2012 WL 2953217 (N.D. Ill. July 19, 2012). All terms of art used herein are taken from those coined in the court's July 19, 2012 Memorandum Opinion and Order.

(3) whether issuance of the stay will substantially injure the other parties;
interests in the litigation; and

(4) where the public interest lies.

Hilton v. Braunskill, 481 U.S. 770, 776 (1987). If the party seeking the stay meets the "likelihood of success" and "irreparable harm" factors, then the district court must consider all four factors using a sliding scale approach. Matter of Forty-Eight Insulations, Inc., 115 F.3d 1294, 1300-01 (7th Cir. 1997). If the movant fails to make the requisite showing of a strong likelihood of success, or irreparable harm, or both, the analysis must end there and the stay must be denied. Id. CPS has failed to come close to meeting any of these requirements.

First, in its July 19, 2012, Opinion, this court found that CPS's first motion to vacate was "near frivolous" for a number of reasons that need not be repeated here. Obviously, had the court thought that an appeal of that decision would be successful, it would not have ruled as it did. Nonetheless, there is always a possibility that the court of appeals will disagree, and under Hilton, the court must determine CPS's chances of convincing the court of appeals to do so. And while CPS need not demonstrate that it has a "probability" of success, something less than a 50% chance is sufficient, it must demonstrate a "substantial case on the merits." Thomas v. City of Evanston, 636 F. Supp. 587, 590 (N.D. Ill. 1986). Nothing, however, in CPS's motion to stay, which mainly regurgitates the arguments it made in its first motion to vacate, changes the court's opinion as to the merits.[2] Consequently, the court finds that CPS has failed to demonstrate that it has a strong likelihood of success on the merits of its appeal of that decision. For this reason alone, the request for a stay must be denied.

---

[2]The court will address several of CPS's new arguments at the end of this opinion.

Second, CPS cannot demonstrate that it would suffer irreparable harm without a stay. CPS's obligations under the Consent Decree ended on August 31, 2012. Contrary to the position CPS takes in its reply brief in support of its motion to stay, no purpose is served in attempting to vacate the Consent Decree, because the Consent Decree itself has ended. The only remaining obligations of any of the parties are under the Agreed Order to Extend Certain Obligations Under the Board of Education of the City of Chicago's Settlement Agreement (Doc. 729; the "Extension Agreement"), under which CPS committed in November 2010 to cooperate with the Monitor in the preparation of her final report. These minimal obligations are entirely separate from those CPS assumed under the Consent Decree. Although CPS complains about complying with its obligations under the Extension Agreement, and is expressly fearful of the Monitor's report, it has never sought specifically to vacate the Extension Agreement.

Consequently, CPS's only remaining obligations involve its cooperation with the Monitor and, if it chooses, responding to her final report, as it agreed to do in the Extension Agreement. That report, like the Monitor's report on ISBE compliance with its Consent Decree, has no injunctive effect and is the product of the compromise reached among ISBE, CPS and the plaintiffs in bringing this case to a conclusion.

CPS complains that it will suffer irreparable harm by having to pay attorney's fees and the Monitor's fees pursuant to its previous commitments in connection with these obligations. As plaintiffs point out, such fees will be minuscule compared to the fees it has paid to plaintiffs' counsel, the Monitor, and its own outside counsel over the 14 years since the Consent Decree was entered. In any event, monetary expenditures rarely support a claim of irreparable harm, and unrecoverable costs of litigation such as attorney's fees never do, "otherwise every

interlocutory ruling in litigation would be subject to immediate appellate review . . . ." In re National Presto Indus., Inc., 347 F.3d 662, 663 (7th Cir. 2003). "Mere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury." Renegotiation Board v. Bannercraft Clothing Co., 415 U.S. 1, 24 (1974).

Moreover, even if such costs could constitute irreparable injury, in the context of this litigation the modest fees to be incurred in the course of winding up this case come nowhere close to meeting this standard. As plaintiffs point out, the fees CPS will likely incur wrapping up the case are insignificant compared to the fees plaintiffs have expended and will expend in the future defending CPS's two motions to vacate, the Seventh Circuit appeal, and the instant motion to stay, all brought on the eve of the expiration of the Consent Decree. The court thus finds that the minimal exposure to CPS from its obligation to pay fees, along with the fact that these fees were agreed to and contemplated by CPS when it entered into the Extension Agreement that brought this case to a conclusion far sooner than plaintiffs had been advocating, cannot result in the type of irreparable harm entitling CPS to a stay pending appeal.

Finally on this subject, the court notes that CPS and its counsel have chosen to prolong this litigation by filing two separate Rule 60 motions to vacate (Docs. 852 and 853) and attempting to derail the Monitor's post-Decree report that CPS had agreed to in its 2010 Extension Agreement. Its surprisingly aggressive efforts to avoid obligations that have almost entirely terminated, and all of which CPS has agreed to, contradict any notion that economies in litigation expenses is of major concern to CPS.[3]

---

[3]In its reply brief, CPS raises the issue of its current financial difficulties and the contentious negotiations currently under way with the Chicago Teachers' Union. The court, as
(continued...)

Even if CPS had demonstrated a likelihood of success on the merits and irreparable harm absent the stay (which it has not), the court finds that the other two Hilton factors have not been met. First, plaintiffs are correct in arguing that they would be substantially harmed by a stay. The court Monitor has been operating for many years under the Consent Decree, and is winding up her tenure in this case by issuing her final report as the parties had agreed in the Extension Agreement. That report will be based on information supplied by CPS and plaintiffs concerning the level of compliance as of the end of the Consent Decree on August 31, 2012. To delay the acquisition of this information in a system as large as Chicago's would put the Monitor, the parties, and the court at a serious disadvantage that the information might grow stale or more difficult to retrieve. More importantly, the Monitor, who has a separate legal career to pursue, as well as her staff who are all educators with their own futures to plan, cannot be expected to sit on their hands for many months while the case winds its way through an appeal of this complexity. It is quite likely that the Monitor and her staff will have moved on by the time the appeal is decided, and the Monitor has stated in open court that she might well be unavailable to resume her duties after a lengthy delay (an unfortunate result that CPS would no doubt like to achieve). The Monitor is prepared to work on her final report immediately, and nothing should stand in the way of that effort.

---

[3](...continued)
well as all parties to this litigation, is well aware of the seemingly perpetual financial crisis facing CPS as well as most large city school systems. That is one of the primary reasons that the court, with the enthusiastic support of CPS, decided to bring this litigation to a close. It seems obvious to the court that CPS could have saved a great deal of its resources by allowing the Consent Decree to end as scheduled on August 31, 2012, and simply respond to the Monitor's final report on CPS, as it did to the Monitor's report on ISBE.

With respect to the fourth Hilton factor, the public interest clearly lies in issuance of the Monitor's final report as soon as possible. Indeed, CPS states in its reply brief that it is not seeking to vacate the Consent Decree as it was enforced through March 2, 2012, the date CPS filed its first Rule 60 motion to vacate. Consequently, even if CPS succeeds in ultimately vacating the Consent Decree as of that date, its obligations under the Consent Decree prior to that date would remain in full force and effect. The public, particularly the people and school children of Chicago and their parents, are entitled to know whether and to what extent CPS performed its obligations under the Consent Decree and, coincidentally, under the IDEA to educate children with disabilities in the least restrictive environment.

Finally, in its briefs in support of its motion to stay, particularly in its reply brief, CPS has made a number of statements and arguments that the court finds to be factually incorrect, unprofessional, and downright insulting. First, in its reply brief (Doc. 904 at p. 2), CPS complains that its motion to vacate serves a "practical purpose" because "[t]his Court had set prior expiration dates, which had been extended at the last minute," implying that the court might have extended the expiration of the Consent Decree beyond August 31, 2012, "at the last minute" to the surprise of CPS. Nothing could be further from the truth. The court extended the Consent Decree on previous occasions only after full briefing and argument by the parties, and only after carefully considering the parties' positions and concluding that both CPS and ISBE needed more time to comply with their obligations. (See Docs 338, 362, 487 and 728.) It was this court, after consulting with the parties and with full agreement by CPS, that decided to bring this case to a final conclusion on August 31, 2012. There has never been any discussion about

extending the Consent Decree beyond that date, and for CPS to imply that the court might violate the Extension Agreement that it had approved is totally out of bounds.

Also in its reply brief, CPS complains that its obligations under the Consent Decree might be extended beyond August 31, 2012, because "ISBE is yet to be dismissed from this case." As discussed at the last status hearing, there is no need to "dismiss" any party from the case at this point because the ISBE Consent Decree (in the nature of an agreed injunction) terminated on August 1, 2011. The Agreed Order to Extend Obligations under the Illinois State Board of Education Settlement Agreement (Doc. 735; December 3, 2010) provides that the case against ISBE will not be dismissed until the court rules on the objections to the Monitor's report on ISBE compliance – an event that has not yet transpired.[4] To imply that the court is somehow holding ISBE (and intends to hold CPS) to Consent Decree obligations beyond the termination date is spurious.

Further, in its reply brief, CPS argues that the court might issue additional injunctive relief based on the Monitor's final report. This is absurd. That report will detail the level of compliance by CPS with the Consent Decree as viewed by the Monitor. Both plaintiffs and CPS have a right to respond to that report, and the court will make appropriate rulings with respect to those responses. There has never been a single word mentioned about additional injunctive relief. CPS expresses a fear that the report may be negative, perhaps because it knows that it has not complied with the Consent Decree in certain areas. The court hopes that this is not the case, but CPS is certainly acting like it has something to hide. In any event, the Monitor's report, as

---

[4]The court notes that ISBE agrees with the Monitor's report and that only CPS has filed objections.

CPS agreed in the Extension Agreement, is for informational purposes and will have absolutely no injunctive or other enforcement effect. CPS's counsel's implication to the contrary can be viewed as nothing but made in bad faith.

Finally, the court finds that CPS's counsel's attack on the Monitor's integrity, and by implication the court's integrity, is wholly unfounded and unprofessional. To be sure, there have been many disagreements over the years between CPS and the Monitor (as well as the court) on issues involving compliance by CPS with its obligations under its Consent Decree. To accuse the Monitor of "lack[ing] independence," bias, and possessing a "skewed vision of [CPS's] LRE compliance" is beyond the bounds of legitimate advocacy. The court has full faith in the Monitor's independence, neutrality and competence. That she has disagreed with CPS on a number of occasions (she has also supported CPS on many occasions) is wholly insufficient to support the unseemly and unprofessional personal attacks lately leveled by CPS's counsel. This relatively new tactic indicates that the flurry of motions by CPS in the last six months may be viewed more as a personal vendetta by some of the lawyers representing CPS than a legitimate effort to bring a jurisdictional matter to the attention of the court. CPS's motives and good faith have been besmirched by this conduct, to the grave disappointment of this court.

CPS's motion to for a stay pending appeal is denied.

**ENTER:** September 10, 2012

_____
**Robert W. Gettleman
United States District Judge**

8